# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

---

|  |  |
|---|---|
| VALERIE JOHNSON-PARKS, | : |
|  | : |
| Plaintiff, | : |
|  | : |
| v. | : Civil Action No. 09-1492 (RLW) |
|  | : |
| D.C. CHARTERED HEALTH PLAN, | : |
|  | : |
| Defendant. | : |

---

## MEMORANDUM OPINION

This matter is before the Court on the defendant's motion for summary judgment.[1]  For

the reasons discussed below, the motion will be granted in part and denied in part`.

## I.  BACKGROUND

The plaintiff, a registered nurse, began her employment with D.C. Chartered Health Plan,

Inc. ("CHP" or "the defendant") on January 23, 2001.  Plaintiff's First Amended Complaint

("Am. Compl.") ¶¶ 14, 16; Def.'s Mem., Ex. 1 (Steinbach Decl.), Ex. I (Objections and

Responses of Defendant D.C. Chartered Health Plan, Inc. to Plaintiff's First Set of

Interrogatories ("Def.'s Interrog. Resp.") No. 3).[2]  CHP, a managed care organization,

participated in the D.C. Medicaid Managed Care Program.  Statement of Material Facts As To

Which There Is No Genuine Issue ("Def.'s SOMF") ¶ 1.  CHP's Medical Director was Lavdena

---

[1]     Defendant's Motion to Strike Paragraph 5 of Supplemental Affidavit of Plaintiff
Submitted in Support of "Surreply" [Dkt. #42] will be granted.

[2]     The declaration of Brian Steinbach lists and describes the exhibits (Ex. A-M) supporting
CHP's motion for summary judgment.  The Court adopts the letter designations of the
declaration.

Orr, M.D, and Francis M. Smith was its Vice President and General Counsel.  *Id.*  In late 2004,

Mr. Smith assumed duties previously assigned to Tracey Charles, the former Director of Human

Resources.  Plaintiff's Brief in Opposition to Defendant's Motion for Summary Judgment ("Pl.'s

Opp'n"), Ex. 2 ("Austin Aff.") ¶ 11.  Karen Morris, Director of Medical Management, Austin

Aff. ¶ 15, was the plaintiff's supervisor, Def.'s SOMF ¶ 1.

The plaintiff was hired as a Utilization Management Coordinator whose "job [it] was to

track Medicaid patients who were members of [CHP], to issue authorizations for medical care in

hospitals and other health care facilities, and to keep timely . . . , accurate and detailed records of

. . . members' medical treatment in CHP's computer tracking system for insurance authorization

purposes."  Def.'s SOMF ¶ 3.[3]  Nurses were particularly useful in this role "because they

understand medical/clinical activities," and most of CHP's utilization review ("UR") nurses

"have hospital experience [and] understand how hospitals operate."  Def.'s Mem., Ex. B ("Smith

Dep.") at 47:20-48:2. The parties do not dispute that a UR nurse was expected to input patient

information in a timely manner, which CHP defined as within 24 hours.  *Id.*  The plaintiff

---

[3]     Plaintiff alleges that she was hired as a Registered Nurse Case Manager/Telephonic Utilization Review Nurse ("UR nurse"), Am. Compl. ¶ 16, whose responsibilities included the "review[] of patient charts to determine whether continued hospital stays would be authorized," *id.* ¶ 17.  According to a position description which came into effect approximately three years after the plaintiff was hired, a UR nurse "[f]unction[ed] as a member of a care management team with primary responsibility for reviewing[] inpatient and outpatient admissions and determining appropriateness and level of care through the use of on-line medical guidelines," and "[f]acilitate[ed] discharge planning activities with the facilities['] inpatient UR nurses and coordinat[ed]/arrang[ed] services and or equipment required by the patient after discharge."  Pl.'s Opp'n, Ex. 11 (Position Description, Utilization Review Nurse, effective February 1, 2004) at 1. The parties may dispute the plaintiff's title and duties, but this dispute does not pertain to a material fact which has any bearing on the outcome of the case.

counters that CHP had a "*goal* that medical records be entered within twenty-four hours of receipt from a hospital."  Pl.'s Opp'n, Pl.'s Aff. ¶ 2 (emphasis added).[4]

Over time, CHP's "business needs changed in many respects."  Def.'s Interrog. Resp. No. 14.  In the early years of the plaintiff's employment at CHP, UR nurses ordinarily did not make onsite visits to hospitals.  *Id.*  During the 2001-2003 time period, however, UR nurses "frequently traveled to hospitals or other health care facilities to obtain medical records and other relevant information" about CHP members and their care.  Def.'s SOMF ¶ 4.  By 2004, UR nurses -- including the plaintiff -- were required to make onsite visits to participating hospitals.  Def.'s SOMF ¶ 5; Def.'s Interrog. Resp. No. 14.

The plaintiff had "difficulty walking," Def.'s Mem., Ex. A ("Pl.'s Dep.") at 31:19, and she was unable "to [walk] to and from the parking lot," *id*. at  31:20, or "walk in a hospital down the long corridor[s]," *id*. at 31:21-22, or "go to multiple floors seeking . . . patient[] charts," *id.* at 32:1-2.  The plaintiff requested, and CHP approved, *id*. at 40:21-41:3, an arrangement such that the plaintiff "continue[d] doing the same job" from CHP's office, *id*. at 32:6-9.  She was the only UR nurse who did not make onsite visits to hospitals.  *Id.* at 32:16-18.  Instead, she obtained patient information by telephone, fax, or computer.  *Id.* at 32:19-33:2.  Hospitals with which CHP had no contract (non-participating hospitals or "non-pars") did not allow onsite reviews, and the plaintiff conducted these reviews from the office for patients at those facilities.  *Id*. at 46:11-47:4; *see* Am. Compl. ¶ 17.

---

[4]    The plaintiff disputes whether CHP had requirement or a "*goal* that medical records be entered within twenty-four hours of receipt from a hospital," Pl.'s Opp'n, Pl.'s Aff. ¶ 2 (emphasis added); however, the time period within which data entry was expected to be accomplished does not appear to be a material fact.

Because the plaintiff was not conducting onsite visits, she was available in the office full time.[5]  Def.'s SOMF ¶ 6.  In September 2002, the plaintiff was promoted to Team Leader of a group of three to five UR nurses.  Am. Compl. ¶¶ 18-19.  The "team was responsible for reviewing patient charts to confirm that continued stays in the hospital were necessary for individual patients," *id.* ¶ 19; *see generally* Pl.'s Dep. at 47:20-51:8.  She was responsible for maintaining contact with nurses on her team who were working onsite and for monitoring their charts.  Pl.'s Dep. at 47:20-48:7.  She also monitored the patient census, patients with long hospital stays, reinsurance, and patient transfers, and she performed UR functions for patients at non-pars.  *Id.* at 48:21-49:11; Def.'s SOMF ¶ 6.  In addition, the plaintiff was "responsible for holding weekly face-to-face meetings with UR staff to coordinate and track patient care."  Def.'s SOMF ¶ 6.  The plaintiff performed the duties of her Team Leader position, including daily contact with team members, from the office by telephone, fax and computer.  Am. Compl. ¶ 20; Pl.'s Opp'n, Ex. 1 ("Pl.'s Aff.") ¶ 4.

Prior to her employment with CHP, the plaintiff sustained "a back injury that impacted her ability to lift and walk, as well as her overall mobility."  Am. Compl. ¶ 15.  In late December 2003 while the plaintiff was at the CHP office, her "back injury became severely aggravated." *Id.* ¶ 22.  The plaintiff explained that her "back had locked up," Pl.'s Dep. at 76:14, causing "excruciating pain . . . down [her] leg and . . . buttocks," such that she "had great difficulty walking[] and . . . couldn't stand at all," *id.* at 77:19-22.  The plaintiff was out of the office on sick leave for six weeks.  Def.'s Interrog. Resp. No. 6; Pl.'s Dep. at 82:5-10, 261:2-5, 262:13-15.

---

[5]    The plaintiff does not dispute this statement of fact, but points out that CHP "did not provided [sic] a job description that demonstrates being in the office full-time was an essential element of the job or documentation that Plaintiff was promoted because she did not travel." Pl.'s Statement of Material Facts to which there Exists a Genuine Issue Necessary to be Litigated ¶ 6.

The plaintiff's condition allegedly "resulted in several impairments that substantially affect several major life activities, including but not limited to walking, standing, and lifting," and "prevented her from working on the floor of any hospital." Am. Compl. ¶ 24.  In January 2004, the plaintiff requested "that she be allowed to continue her employment from home." *Id.* ¶ 25; Def.'s Mem., Ex. J (Responses to Defendant's Interrogatories ("Pl.'s Interrog. Resp.") No. 4).  CHP approved her request.[6]  Am. Compl. ¶ 26; Def.'s Interrog. Resp. No. 4; Pl.'s Dep. at 262:10.  The plaintiff thus was excused not only from attending weekly meetings in the office, but also from making onsite visits to hospitals.  Def.'s Interrog. Resp. No. 14.  While working from home, the plaintiff allegedly "was able to complete the essential tasks of her employment." Am. Compl. ¶ 27.  Although the plaintiff believed that the work-from-home arrangement "would be short term," Pl.'s Dep. at 83:9-10; 97:17-22, she did not return to the office, *id.* at 83:14-16.

According to the plaintiff's treating physician, Dr. Smith S. Ho, as of March 3, 2004, the plaintiff was partially incapacitated and could continue light duty work, provided that she take frequent breaks to lie down.  Pl.'s Dep., Ex. 5 (Disability Certificate dated March 3, 2004).  Dr. Ho made the same recommendation for the remainder of 2004.  *See* Pl.'s Opp'n, Ex. 3 (Disability Certificates dated April 1, 2004 and June 17, 2004).

Apparently with the understanding that the plaintiff could return to the office with accommodations, CHP offered to provide the plaintiff a chair and a sofa for her use during breaks, Pl.'s Dep. at 98:22-101:19, and a handicapped parking space, Plaintiff's Response to Defendant's Requests for Admission ("Pl.'s Resp. to Def.'s Req. for Admis.") No. 3.  The plaintiff rejected the offers because, in her opinion, "these accommodations were not sufficient

---

[6]     In January 2004 CHP approved the second of two requests by the plaintiff to work from home.  Pl.'s Dep. at 82:5-83:3.

to accommodate her medical condition."  *Id.*  She explained that she could not "lie on a couch"

because it would be "extremely painful" to do so on such an "uneven" surface.  Pl.'s Dep. at

84:4-6.  Furthermore, the only spaces for a couch were a kitchenette and the front lobby, Austin

Aff. ¶¶ 24-25, and presumably neither area was conducive to rest.  The plaintiff "preferred to

continue to work from home."  Pl.'s Resp. to Def.'s Req. for Admis. No. 3.  According to CHP,

on several occasions it "requested that it be provided a diagnosis, prognosis and expected date of

return to work, but such was never provided, and Plaintiff apparently viewed such . . . requests

for information to be hostile and harassing."  Def.'s Interrog. Resp. No. 14.  According to the

plaintiff, she "supplied regular information about her prognosis and diagnosis to Tracey

Charles."  Pl.'s Resp. to Def.'s Req. for Admis. No. 5.

On July 1, 2004, Ms. Morris conducted the plaintiff's performance review.  *See* Def.'s

Mem., Smith Decl., Ex. A (Annual Performance Appraisal dated July 1, 2004).  The report

generally was favorable, noting, for example, that the plaintiff's "job skill and knowledge about

rehab[ilitation]" was "untouchable."  *Id.*, Ex. A at 2.  Ms. Morris "rated Plaintiff's performance

as 'meeting' to 'exceeding' expectations in a vast majority of categories and as 'needs

improvement' in four categories."  *Id.* ¶ 4 & Ex. A at 3.  It was noted, however, that the plaintiff

received verbal counseling regarding her lack of attention to detail and "the importance of

communicating with her staff on a daily bases [sic]."  *See id.*, Ex. A at 2.  The review comments

indicated that the plaintiff was "working on" submitting timely documentation and meeting other

performance measures.  *See id.*, Ex. A at 2-3.

The plaintiff's absence from the office meant that she did not attend weekly meetings in

person; instead she participated by telephone.  Pl.'s Opp'n, Pl.'s Aff. ¶ 3; Def.'s Interrog. Resp.

No. 11.  According to the plaintiff, Ms. Morris would "put [her] on the spot sometimes on

teleconferencing, asking: 'When are you coming back to the office?'"  Pl.'s Dep. at 64:13-14.

Ms. Morris "seemed angry with [the plaintiff] on the phone" when the plaintiff was speaking, *id.*

at 64:20-21, and "she would interrogate [the plaintiff by] asking [her] the same question"

repeatedly, *id.* at 65:3-4.  The plaintiff was told that Ms. Morris was "making all these faces and

rolling her eyes up and sighing" as the plaintiff spoke.  *Id.* at 66:16-18.  At least one other

employee thought that Ms. Morris "was perceived as very mean, her condescension and mean

behavior were directed particularly towards [the plaintiff and another employee]."  Austin Aff. ¶

17.  Ms Morris also called the plaintiff "an air head," Pl.'s Dep. at 231:4, and suggested that the

plaintiff was dyslexic, *id.* at 230:9-10.

According to the plaintiff, Ms. Morris "demanded that Plaintiff's accommodation of

working from home cease and that she report to work in the office, while other employees on

Plaintiff's team, who did not have disabilities, were permitted to work from home."  Am. Compl.

¶ 29.  She "frequently" would tell the plaintiff that she needed the plaintiff to return to the office.

Pl.'s Dep. at 106:8-107:8.  Ms. Morris allegedly "harassed Plaintiff because of her disability,"

Am. Compl. ¶ 30, and this behavior "was so pervasive and severe that it prompted Plaintiff to

call [CHP's] 'Employee Hot Line,'" *id.* ¶ 31, on September 8, 2004, Smith Decl. ¶ 5.[7]  "The

---

[7]     CHP's Compliance Hotline was "intended for the reporting (anonymous or otherwise) of any matters which members, employees and providers might interpret to involve waste, fraud, abuse or discrimination against members," not for "employee complaints which [were] to be directed to Human Resources."  Reply in Support of Defendant's Motion for Summary Judgment, Suppl. Smith Decl. ¶ 2; *see* Smith Dep. at 137: 14-17.  The plaintiff apparently believed that the compliance officer who would have received and reviewed her call "could address simple employment complaints."  Smith Dep. at 137:19-20, 140:8-10.  A call to the hotline was not the proper means to challenge a performance review.  *Id.* at 140:12-15.  An employment complaint likely would have been referred to CHP's Human Resources officer.  *Id.* at 138:11-22.  The plaintiff heard nothing further about her call to the hotline.  Pl.'s Dep. at 232:20-233:11.

subject of the call was 'work environment issues,' and the sub-category was 'unfair treatment.'"

Smith Decl. ¶ 5.  The report of the call stated:

> Caller, Valerie Parks, employee, stated that "for months and months" [did not provide exact dates]," Karen Morris, director of medical management, has spoken to her in a "degrading manner."  Ms. Parks stated that Ms. Morris often calls her an "airhead."  Ms. Morris also claimed that Ms. Parks is dyslexic, which Ms. Parks stated is untrue.   Ms. Parks feels that Ms. Morris is very unprofessional and needs to be reviewed by compliance.   Caller stated, "The manner in which [Ms. Morris] speaks to me is not fair and equal.  [Ms. Morris] degrades me in front of everyone during case round meetings [in which employees discuss the nature of healthcare received at different facilities].  You don't do that.  I want fair and equal treatment."

Smith Decl., Ex. B (Report of complaint dated September 8, 2004).  The report did not mention the plaintiff's disability and did not assert discrimination or harassment because of the plaintiff's disability.  *See id.*

There came a time when CHP officials developed "substantial privacy concerns with regard to employees who worked from home," particularly with respect to the handling of patient records containing protected health information.  Def.'s SOMF ¶ 15; Pl.'s Resp. to Def.'s SOMF ¶ 15.  Issues also arose with respect to the plaintiff's working from home, her absence from weekly meetings, and her inability "to participate fully in the interactive communication process with regard to member care."  Def.'s SOMF ¶ 16; Def.'s Interrog. Resp. No. 11.  For example, the plaintiff's former supervisor had never met the plaintiff, did not know the plaintiff's work hours, and noticed that sensitive patient information was being sent to the plaintiff from hospitals by fax.  Def.'s Mem., Ex D ("Dodoo Dep.") at 55:7-13.  Mr. Smith also was quite concerned about employee productivity and complaints he had received from hospitals regarding the timeliness of authorizations for hospital stays.  *See* Smith Dep. at 15:7-18:22, 38:1-41:17.

"By 2004, [CHP] required UR employees to go onsite, a requirement from which Plaintiff initially was excused."  Def.'s Interrog. Resp. 14.  It was determined that, "[t]o effectively handle Team Lead duties, . . . onsite travel and oversight" were required.  *Id.*  In addition, CHP had become "increasingly concerned with privacy protocols," and therefore urged all employees who worked from home to return to the office, "simply to insure quality of work and effective communication." *Id.*  It was in this context that, in October 2004, CHP officials were evaluating job descriptions.  *See* Am. Compl. ¶ 32.

On October 27, 2004, Ms. Charles sent a letter to Dr. Ho which in relevant part stated:

> I understand that [the plaintiff] is a patient of yours.  Since January 2004, we have been receiving regular physician notes from your office regarding [the plaintiff's] ability to perform her current position . . . .  Based on the physician notes from your office, for the past 10 months, we have accommodated [the plaintiff] by allowing her to work from home.  We are currently evaluating our job descriptions and need to make determinations regarding expectations of work environment for her position as Team Leader overseeing five nurses.  This position requires the incumbent to be able to travel to different sights [sic] to oversee staff.  With her current medical condition, we need your assessment as to whether or not [the plaintiff] can be onsite in the office and travel, as her position requires.

Pl.'s Dep., Ex. 4 (Letter from Tracey A. Charles, Director of Human Resources, CHP, to Dr. Smith S. Ho dated October 27, 2004).  Dr. Ho responded:

> [The plaintiff] has been under my professional care for the treatment of adult onset diabetes, hypertension, as well as osteoarthritis, specifically involving her hip and knees, as well as her back for the past several years.  Since January[] 2004, she has been performing her duties at home[] due to her medical condition.  Recently she has had a fall and sustained a tear to the meniscus of her left knee.  This required arthroscopic surgery . . . on October 29, 2004.
>
> Based on her current medical condition . . . , it is my medical impression that she is unfit to fulfill her duty as a Team Leader

> overseeing five nurses. She will not be able to travel to different sites to oversee the staff at this time. However, she should be able to continue to perform her duties from her home, if this can be arranged.

*Id.*, Ex. 3 (Letter from Smith S. Ho, M.D., to Tracey A. Chow [sic] dated November 8, 2004); *see* Am. Compl. ¶ 33.

CHP had not been apprised of the plaintiff's knee surgery prior to receipt of Dr. Ho's letter. *See* Dodoo Dep. at 74:7-76:5. And "[i]f an employee of CHP has scheduled surgery or otherwise [was] aware that [she would] need to take sick time, the employee [was] required to provide advance notice of such so that work can be assigned elsewhere as appropriate." Reply in Support of Defendant's Motion for Summary Judgment ("Reply"), Supp. Smith Decl. ¶ 4. "Given Plaintiff's job duties and the immediate turn around time required of her, it would have been essential that she notify [CHP] in advance of any planned absence." *Id.* The plaintiff's time sheets showed that she reported no sick leave for the weeks ending October 15, October 22, October 29, and November 5, 2004. Smith Decl. ¶ 8; *see id.*, Ex. C (Bi-Weekly Timesheets).

By December 2004, Dr. Ho determined that the plaintiff's limited mobility allowed her to work from home only, with frequent breaks. Pl.'s Opp'n., Ex. 3 (prescription dated December 28, 2004).[8]

---

[8]    Apparently there was no follow-up until October 2005, when Dr. Ho recommended:

> Due to multiple medical conditions which include chronic back and neck pain, please extend the work at home accommodation and continue home teleconference.

Pl.'s Opp'n, Ex. 3 (prescription dated October 3, 2005). The plaintiff now claims that this note had been sent from Dr. Ho's office to CHP, *see* Pl.'s Aff. ¶ 5, but Mr. Smith did not receive it. *See* Supp. Smith Decl. ¶ 7.

In early 2005, an incident occurred involving a patient at Howard University Hospital. The patient was to have been discharged from the hospital and transferred to another facility, but the transfer did not occur because the patient instead was taken to the hospital's intensive care unit.  Pl.'s Dep. at 135:1-16.  "Plaintiff had been involved in planning the patient's discharge," yet she "did not discover for many weeks that he was not actually discharged."  Def.'s SOMF ¶ 37; Smith Dep. at 43:8-21.  According to CHP, the plaintiff "did not advise her UR nurse colleague who had previously been tracking the patient that he had not been discharged."  *Id*. According to the plaintiff, "the total responsibility fell on" the UR nurse responsible for tracking this patient, Pl.'s Dep. at 137:11, and who had turned the matter over to the plaintiff for discharge planning, Def.'s SOMF ¶ 37; Smith Dep. at 43:22-44:4.  No disciplinary action was taken against the plaintiff, Smith Dep. at 50:3-7, but the matter aroused concern for CHP management.  Patient census information was not properly monitored, Smith Dep. at 38:14-15, and there were "several discussions about . . . the process," *id*. at 44:14-15.  "[I]f the member was supposed to have been discharged, why [didn't the plaintiff] tell somebody that the person never got services?"  Smith Dep. at 44: 8-12.  Questions arose as to "what could have happened in this process that would have told us where this member was and what was going on and how it might've changed the results[.]"  Smith Dep. at 46:1-4.

It was determined that "[p]art of the problem was a lack of communication."  Smith Dep. at 48:12-13.  Had the plaintiff been working in the office rather than from home, "there would've been more . . . opportunity for communication that Howard had not provided the right information for us . . . to know the person was there" and had not been discharged.  *Id*. at 48:14-17.  "[I]f you have daily interaction . . . [or] if you're there or if you're dealing with people on a day-to-day basis, the likelihood of discussions taking place that should take place is much

greater."  Smith Dep. at 49:1-5.  CHP "needed people who reviewed the [patient] census for themselves every day," Smith Dep. at 49:18-19, and who could work together as "a cohesive working team," *id.* at 49:22.

Mr. Smith called the plaintiff in early 2005, after the incident involving the patient at Howard University Hospital, *id*. at 89:21-90:6, to discuss her work from home arrangement, *see id*. at 88:18-89:2.  "It was another one of those strange conversations," *id*. at 4-5, after which Mr. Smith "just didn't have an answer," *id*. at 19-20, as to "why [the plaintiff] was working from home," *id*. at 88:22.

It was determined that, "[t]o effectively handle Team Lead duties, . . . onsite travel and oversight" were required.  Def.'s Interrog. Resp. 14.  The plaintiff was informed that she would be expected to make onsite visits.  Pl.'s Interrog. Response No. 4; Smith Dep. at 92:6-93:3.  She also was informed that she could not both remain Team Leader and work from home.  Pl.'s Dep. at 94:17-95:2.  Mr. Smith sent the plaintiff a letter to this effect:

> [CHP] has concluded that due to recent changes in [its] business operations, you must be physically present at the [CHP] Corporate Headquarters to effectively perform your job duties, and as a result, your current work from home status is no longer tenable. [Y]ou indicated that you are currently unable to return to work here as requested and did not know when you might be able to return.  To help us resolve this matter, [CHP] is requesting that by . . . February 18th, you provide us with a doctor's statement indicating your prognosis and a projected date that you would be able to return to work.
>
> If you are unable to provide a date in the near future on which you will be released by your doctor to physically return to work, you are at liberty to pursue . . . [e]xtended sick leave through the Family and Medical Leave Act, or [l]ong [t]erm [d]isability [c]ompensation . . . .

> Should we not hear from you by the close of business, February 25th, 2005[,] or if you have not returned to work by that time, we will unfortunately move to terminate your employment.

Pl.'s Dep., Ex. 7 (Letter from Francis S. Smith, Acting Human Resources Director, CHP, to plaintiff dated February 14, 2005).

When Mr. Smith sent the letter, he was not aware that Ms. Morris already had devised a new arrangement which would allow the plaintiff to continue to work from home.  Smith Dep. at 93:9-98:19.  The plaintiff was not "push[ed] to return" to the office, Pl.'s Dep. at 95:3-5, and "therefore continued working from home, but no longer in the capacity as Team Leader," Pl.'s Interrog. Response No. 4.  Instead, she retained her UR nurse duties for non-participating hospitals and was given new responsibility for discharge planning.  Def. Interrog. Response No. 14; Pl.'s Interrog. Response No. 4; Pl.'s Dep. at 95:2-96:17; Smith Dep. at 93:2-96:12.  The plaintiff's salary did not change.  Pl.'s Dep. at 116:6.

The District of Columbia Medicaid Office contacted CHP in October 2005 regarding the discharge of "Patient X" from Georgetown University Hospital on September 23, 2005.  Def.'s Mem., Ex. 1, Ex. E ("Orr Dep.") at 18:3-16; Smith Dep. at 51:4-11.  Patient X was a CHP member at the time of her admission on August 13, 2005.  Orr Dep. at 26:18.  She was discharged "without adequate discharge planning," Smith Dep. at 51:6-7, "in the care of her 16-year old daughter," Orr Dep. at 18:6-9, who "had been required to stay home from school and take care of the parent," Smith Dep. at 51:8-11.

Dr. Orr and Ms. Morris called the plaintiff on October 3, 2005, Orr Dep. at 19:9-15, 21:16-17, to discuss the matter, as it was the plaintiff's "responsibility to get the facts and get the information" about the discharge, *id.* at 22:10-11, and to communicate with the hospital, *id.* at

24:16-17.[9]  Dr. Orr did not "remember [the plaintiff] telling her anything definitive as to . . . why the member had been discharged home" to her minor daughter's care.  *Id*. at 20:1-4.  The plaintiff apparently declined to discuss the matter with Dr. Orr and Ms. Morris.  She asked "to have HR present, because [she] just felt uncomfortable being hit with an accusation that was false."  Pl.'s Dep. at 167:6-8.

A second telephone conference call took place on October 5, 2005, in which Mr. Smith, Dr. Orr, Ms. Morris, and the plaintiff participated.  Smith Dep. at 54:19-22.  Mr. Smith's "normal process in doing an investigation involving an employee matter was first to interview the employee, to ask [her] to tell [him] what happened."  *Id*. at 55:10-13.  The plaintiff "declined to or was not able to provide full background information" during that call; neither he nor Dr. Orr was "able to gain an understanding of what transpired with Patient X."  Smith Decl. ¶ 16.

If a person is insured by CHP on the date of her admission to a hospital, she is insured by CHP for the entire duration of the hospital stay.  Supp. Smith Decl. ¶ 5.  UR nurses are responsible for tracking a patient's medical treatment and for providing appropriate authorizations for her entire hospital stay.  *Id.*  It was not uncommon for members to disenroll and reenroll as CHP members within a few days or weeks, and "UR nurses are responsible for tracking patient status and are automatically provided updates on patient status through CHP's computer system."  *Id.*  If a UR nurse enters the patient's identifying information into the system when entering notes daily, "the patient's name is flagged as having been disenrolled or re-enrolled."  *Id.*  If a UR nurse properly and timely enters notes, she "should learn within a day or two if the member has disenrolled."  *Id.*  "Under no circumstances should a CHP UR nurse rely on a hospital to provide such information."  *Id.*

---

[9]     Ms. Morris called the plaintiff on October 4, 2005, Pl.'s Dep. at 156:19-20, at which time she allegedly "accused [the plaintiff] of doing a high risk discharge plan," *id.* at 156:21-22.

According to the plaintiff, on an unspecified date, she had received "a sketchy review . . . that didn't give . . . a clear picture of why [Patient X] was still [in the hospital]."  Pl.'s Dep. at 144:5-7.  Apparently the plaintiff entered notes into CHP's computer system regarding Patient X on or about the date of her admission to Georgetown University Hospital, entered no notes during Patient X's hospital stay, and at 1:20 a.m. on October 5, 2005, days after the patient's discharge on September 23, 2005, entered information covering a period of several weeks into the system.  Smith Decl. ¶¶ 12-15.  By the time the plaintiff received relevant hospital records, the patient already had been discharged, *id.* at 155:18-156:18, unbeknownst to the plaintiff, *id.* at 157:11-15.  "Despite having entered weeks of patient records into the system only hours before the October 5, 2005 telephonic meeting," the plaintiff "declined to or was not able to provide full background information to CHP management."  Smith Decl. ¶ 16.  The plaintiff claimed that the hospital did not send her timely and complete records and that she was unable to enter the notes sooner.  Pl.'s Dep. at 196:11-197:15, 200:20-201:17; Pl.'s Opp'n, Pl.'s Aff. ¶ 12; Def.'s Mem., Ex. F (Sondgerath Dep.) at 39:2-10.

Mr. Smith described the October 5, 2005, conference call as follows:

A [Smith]:     We got on the phone with [the plaintiff] and she wouldn't tell me what happened.

Q:     You mean she wouldn't talk to you?

A:     Oh, she talked.

Q:     And what did she say?

A:     "Well, I think that in the future, we need to have a closer working relationship."  She said, "I think that I need to work closer with Karen.  I think we need to have more communication."

Q:     Well, did you ask her what happened?

A:     Yes.  Repeatedly.

Q:     And she did not tell you what happened?

> A:      She didn't even respond.  She just kept talking and talking and talking.  She wouldn't respond to any question that I asked her.
>
> Q:      After that conversation, what step did you take?
>
> A:      Well, I said to her, I told her flat out, I think this is unprofessional conduct.  I've never had an employee, in my career, refuse to tell me anything about the facts.  I said I need to know what happened.  Explain it.  And she just would not answer.  I've never really encountered anything like it.   I was completely nonplused.  Most people have given an explanation of some sort, even if it was a bad one.  She wouldn't tell me anything.  I told her . . . that I consider that to be insubordinate, you know, that we're asking you a question about something that was your professional responsibility, and you should respond.  I mean, she went off on something.  I mean, it was a bizarre conversation, in my opinion.  I told her we would get back to her.

Smith Dep. at 55:15-57:4.  Smith expressed to Dr. Orr that the plaintiff's "conduct was inappropriate and unprofessional," *id.* at 58:9-10, and "that her failure to respond in any manner . . . was insubordinate and that she should be terminated for that reason," *id.* at 58:13-16.

The plaintiff claimed that Mr. Smith, Dr. Orr and Ms. Morris "asked [her] to explain why [she] permitted a high risk discharge plan," and the plaintiff explained that "didn't know about the discharge plan."  Pl.'s Aff. ¶ 14.  She also stated that Patient X's daughter was 21 years of age.  *Id.*

The plaintiff was terminated effective October 10, 2005, "for an infraction of Section 11.5 in the CHP Employee Handbook," Smith Decl., Ex. F (Letter from Francis S. Smith, Senior Vice President & General Counsel, CHP, to plaintiff dated October 10, 2005), which lists insubordination as an example of gross misconduct for which a CHP employee may be disciplined immediately, *see* Pl.'s Opp'n, Ex. 14 (Chartered Employee Handbook) at 26.  "Ms. Morris did not participate in the . . . decision," and in fact it was she who "had frequently urged [Mr. Smith] to continue Plaintiff's work from home arrangement."  Smith Decl. ¶ 19.

Mr. Smith made clear at his deposition that the plaintiff was not terminated because of Patient X's discharge or the quality of the discharge plan:

> Q:     So the reason she was terminated was not because of the discharge at Georgetown, it was because of what you have characterized as insubordination in this conversation?
>
> A:     The failure to respond at Georgetown was the impetus.  If she had had an explanation for that, I would have listened to it and I would've investigated the circumstance, and I would've made a determination as to whether or not the explanation was adequate.
>
> Q:     Let me make sure I understand . . . .  At the close of the conversation during which . . . there was no response to your questions and you concluded that it was unprofessional conduct and she was insubordinate, it was your recommendation at that time that the failure to respond was enough to terminate her?
>
> A:     Yes.
>
> Q:     And that was the reason for her termination?
>
> A:     Yes.

Smith Dep. at 58:17-59:16.

The plaintiff sent a letter by fax to the Equal Employment Opportunity Commission ("EEOC") on August 4, 2006, explaining her medical conditions and her version of events leading to her termination.  Pl.'s Dep., Ex. 6 (Fax to EEOC from plaintiff dated August 4, 2006). She "perfected" the EEOC charge on December 8, 2006, by filing a formal charge of discrimination against CHP.  *Id*., Ex. 8 (Charge of Discrimination, EEOC Charge No. 570-2006-01770, dated December 8, 2006).  The narrative portion of the charge read:

> I.     In 2001, I was hired by Respondent to work as a RN Case Manager/Telephonic Utilization Review Nurse in UR Services. Later, I was promoted to Team Leader in UR Services.  I have a disability which substantially limits major life activities. Moreover, I was qualified to perform my essential job functions with a reasonable accommodation (i.e., full-time "work-at-home" job assignments).  From approximately 2/04 to 10/05, I received

17

this reasonable accommodation.  However, in spite of receiving this managerial accommodation, Karen Morris, Director of Medical Management, harassed me by continually issuing me ultimatums to either "go on disability" or work in the office in lieu of "work-at-home assignments."  On 10/4/05, Respondent issued me an ultimatum to either resign or be discharged due to errors in a hospital discharge plan.  I was not responsible for these errors since this discharge plan was implemented without my knowledge. Subsequently, on 10/13/05, prior to a decision on this most recent ultimatum, I learned that I had been unjustly discharged from employment.

II.     I believe that I have been discriminated against in violation of the [ADA].

*Id.*  In response to the EEOC's Notice of Charge of Discrimination, *see id.*, Ex. 8 (Notice of

Charge of Discrimination, EEOC Charge No. 570-2006-01770, dated December 22, 2006), Mr.

Smith explained the termination decision as follows:

[The plaintiff] was terminated because of her failure to perform her duties adequately.  [She] was responsible for ensuring that a patient had proper home care following a hospitalization.  [Her] failure to do so resulted in the patient's teenage daughter having to stay home from school and care for the patient.  When the issue was discussed with [the plaintiff], she refused to understand her role in the patient's care or accept any responsibility.  [The plaintiff's] refusal to understand her involvement or to accept responsibility for the failure to ensure proper care was the reason for her termination.  She did not even wish to discuss the facts or her performance failures.

Pl.'s Mem. in Opp'n to Def.'s Mot. to Dismiss, Ex. D (Letter to Stanika K. Smith, Investigative

Support Representative, Washington Field Office, EEOC, from Francis S. Smith, Senior Vice

President & General Counsel, CHP, dated January 17, 2007) at 1-2.[10]  On September 8, 2008, the

EEOC determined "that the evidence obtained during the investigation establishes that there is

---

[10]     The plaintiff docketed this item [Dkt. #14] on February 22, 2010, without having redacted certain personal information as Local Civil Rule 5.4(f) requires.  She since has filed a corrected copy [Dkt. #46] in response to the Court's February 15, 2013 minute order,

reason[] to believe that a violation of the [ADA] has occurred."  Am. Compl., Ex. (Letter of

Determination, Charge No. 570 2006 01770, dated September 11, 2008) at 1.

## II.  DISCUSSION

### A.  *Summary Judgment Standard*

Defendant moves for summary judgment pursuant to Rule 56 of the Federal Rules of

Civil Procedure.  "The court shall grant summary judgment if the movant shows that there is no

genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

law." Fed. R .Civ. P. 56(a).

A party asserting that a fact cannot be or is genuinely disputed must support the assertion

by "citing to particular parts of materials in the record, including depositions, documents . . .

affidavits or declarations, stipulations . . ., admissions, [or] interrogatory answers[, or by]

showing that the materials cited do not establish the absence or presence of a genuine dispute, or

that an adverse party cannot produce admissible evidence to support the fact."  Fed. R. Civ. P.

56(c)(1).  "If a party fails to properly support an assertion of fact or fails to properly address

another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact

undisputed for purposes of the motion."  Fed. R. Civ. P. 56(e).  When considering a motion for

summary judgment, the Court may not make credibility determinations or weigh the evidence;

the evidence must be analyzed in the light most favorable to the nonmoving party, with all

justifiable inferences drawn in his favor.  *Anderson v. Liberty Lobby*, *Inc.*, 477 U.S. 242, 255

(1986).  "If material facts are at issue, or, though undisputed, are susceptible to divergent

inferences, summary judgment is not available."  *Moore v. Hartman*, 571 F.3d 62, 66 (D.C. Cir.

2009) (citation omitted).  The mere existence of a factual dispute does not bar summary

judgment.  *See Anderson*, 477 U.S. at 248.  "Only disputes over facts that might affect the

outcome of the suit under the governing law will properly preclude the entry of summary

judgment."  *Id*.  The adverse party must "do more than simply show that there is some

metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*.,

475 U.S. 574, 586 (1986), and cannot rely on conclusory assertions without any factual basis in

the record to create a genuine dispute.  *See Ass'n of Flight Attendants - CWA v. U.S. Dep't of*

*Transp.*, 564 F.3d 462, 465-66 (D.C. Cir. 2009).

### B.  The Plaintiff's ADA Claims

The plaintiff brings this action against CHP under the Americans with Disabilities Act

("ADA"), *see* 42 U.S.C. § 12101 *et seq.*  Generally, no employer subject to the ADA "shall

discriminate against a qualified individual on the basis of disability in regard to job application

procedures, the hiring, advancement, or discharge of employees, employee compensation, job

training, and other terms, conditions, and privileges of employment."  42 U.S.C. § 12112(a).

Nor may an employer "discriminate against any individual because such individual has opposed

any act or practice made unlawful [under the ADA] or because such individual made a charge . .

. under [the ADA]."  *Id.* § 12203(a); *see Smith v. District of Columbia,* 430 F.3d 450, 454-55

(D.C. Cir. 2005).  A request for a reasonable accommodation is a protected activity under the

ADA.  *See DuBerry v. District of Columbia*, 582 F. Supp. 2d 27, 37 (D.D.C. 2008).  A "qualified

individual" is "an individual who, with or without reasonable accommodation, can perform the

essential functions of the employment position that [she] holds."  *Id.* § 12102(8).  "CHP

concedes for purposes of [its summary judgment] motion that Plaintiff was a person with a

disability who during her employment was otherwise qualified for her job (at least until it

became a requirement for all UR nurses to go onsite and for a Team Lead to be able to come to the office), and therefore was entitled to a reasonable accommodation." Def.'s Mem. at 23.

### C.  Counts II and IV of the Amended Complaint Are Time-Barred

In Count II, the plaintiff claims that CHP initially "provided [her] the accommodation of working from home," Am. Compl. ¶ 60, subsequently "revoked the accommodation," *id.* ¶ 61, and "terminated [her] when she did not return to working at headquarters," *id.*, ¶ 62, in violation of the ADA.  In this way, the plaintiff claims, CHP failed "to provide . . . the reasonable accommodations to which she was legally entitled." *Id.*  In Count IV, the plaintiff claims that CHP "unlawfully discriminated against [her] by allowing [Ms. Morris] to repeatedly harass her because of her disability." *Id.* ¶ 77. She further claims to have been "subjected to unwelcomed harassment by her supervisor [Ms. Morris]," *id.* ¶ 80, and such harassment "was sufficiently severe and pervasive to alter the terms, conditions and privileges of [her] employment," *id.* ¶ 82. Specifically, the plaintiff claims that she "was prevented from working from home even though [Ms. Morris] allowed other employees without disabilities to do so." *Id.*  CHP moves for summary judgment on the plaintiff's failure-to-accommodate (Count II) and hostile work environment (Count IV) claims on the ground that both are time-barred. *See* Def.'s Mem. at 20-23.

A plaintiff bringing an employment discrimination claim under the ADA first must file a charge of discrimination "within a specified period (either 180 or 300 days, depending on the State) after the alleged unlawful employment practice occurred." *Hodge v. United Airlines,* 666 F. Supp. 2d 14, 20 (D.D.C. 2009) (quoting *Ledbetter v. Goodyear Tire & Rubber Co., Inc.,* 550 U.S. 618, 623-24 (2007)); *see also Marshall v. Fed. Express Corp.,* 130 F.3d 1095, 1098 (D.C.

Cir. 1997) ("Before bringing suit in federal court, ADA plaintiffs, like those under Title VII, must exhaust their administrative remedies by filing an EEOC charge and giving the agency a chance to act on it."). "[I]f the employee does not submit a timely EEOC charge, the employee may not challenge that practice in court." *Ledbetter,* 550 U.S. at 624 (citing 42 U.S.C. § 2000e-5(f)(1)). The District of Columbia is a "deferral jurisdiction," *see Kornegay v. AT&T,* 579 F. Supp. 2d 34, 37 (D.D.C. 2008), such that a claimant must file her charge with the EEOC no later than 300 days after the alleged unlawful practice occurred. 5 U.S.C. § 2000e-5(e); *see Robinson-Reeder v. Am. Council on Educ.*, 532 F. Supp. 2d 6, 12 (D.D.C. 2008).

The Court previously determined that the plaintiff's cause of action accrued no earlier than October 10, 2005, the date on which CHP "communicate[d] to [the] plaintiff an effective date of termination." *Johnson-Parks v. D.C. Chartered Health Plan*, 713 F. Supp. 2d 39, 45 (D.D.C. 2010). There is no dispute that the plaintiff's "submissions . . . to the EEOC on August 4, 2005, constitute[d] a written charge of disability discrimination . . . that . . . was timely filed before the 300-day limitations period had expired." *Id.* at 46. According to CHP, any "alleged unlawful employment practices which occurred more than 300 days prior to the filing of a charge are time barred, and cannot be the basis for . . . ADA claims, even where they have a continuing effect." Def.'s Mem. at 21-22. It follows, asserts CHP, that "all events that occurred prior to October 8, 2005, the date 300 days before the charge was filed . . . , cannot be the basis for [the plaintiff's] ADA claims." *Id.* at 22. Based on the plaintiff's amended complaint, the only action falling within the relevant 300-day limitations period and which the plaintiff now may challenge occurred on October 10, 2005 -- her termination. *Id.* Plaintiff does not challenge the October 8, 2005 date, *see* Pl.'s Opp'n at 4-5, thus the Court adopts it as the operative date.

The plaintiff responds by arguing that Dr. Ho's note, dated October 3, 2005, comprises a discrete act – a separate request for the accommodation of working from home – to which CHP did not respond.  Pl.'s Opp'n at 5.  CHP's purported "fail[ure] to engage in the interactive process" amounts to its "fail[ure] to accommodate [the plaintiff] between October 8, 2005 and October 13, 2005."  *Id.* at 4.  Because CHP neither reaffirmed the work-from-home arrangement upon receipt of Dr. Ho's October 3, 2005 note nor proposed an alternative, the plaintiff argues that "both the failure to accommodate in response to Plaintiff's October 3, 2005 request . . . and Plaintiff's termination occurred within 300 days of her EEOC complaint [and] both are actionable."  *Id.* at 5.  The Court rejects this argument.[11]

---

[11]     The plaintiff further asserts that her hostile work environment claim is actionable, even if events occurred prior to October 8, 2005.  Pl.'s Opp'n at 5-6.  She argues that "the harassment she experienced from her supervisor Karen Morris" from which the claim arises began upon her first request for a reasonable accommodation in January 2004, and continued until she learned of her termination on October 13, 2005.  *Id.* at 6.  Even if the plaintiff were to show that her hostile work environment claim is timely, there is an independent basis for dismissal of the claim.

"To determine whether a hostile work environment exists, the court looks to the totality of the circumstances, including the frequency of the discriminatory conduct, its severity, its offensiveness, and whether it [interferes] with an employee's work performance."  *Hunter v. District of Columbia,* 797 F. Supp. 2d 86, 92 (D.D.C. 2011) (quoting *Baloch v. Kempthorne,* 550 F.3d 1191, 1201 (D.C. Cir. 2008)).  Her claim survives only if she shows that CHP subjected her to "discriminatory intimidation, ridicule, and insult" that is "sufficiently severe or pervasive to alter the conditions of [her] employment and create an abusive working environment."  *Baloch,* 550 F.3d at 1201 (quoting *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21(1993)).

In Count IV, the plaintiff alleges that CHP "unlawfully discriminated against [her] by allowing . . . Karen Morris to repeatedly harass [her] because of her disability."  Am. Compl. ¶ 77.  That harassment "was directed at [the plaintiff's] disability and her need for a reasonable accommodation."  *Id.* ¶ 81.  Allegations that Ms. Morris "demanded that [the plaintiff's] accommodation of working from home cease and that she report to work in the office," *id.* ¶ 29, that she "continually harassed" the plaintiff, *id.* ¶ 30, are far too vague to support a hostile work environment claim.  The pleading is silent as to specific examples of Ms. Morris' alleged offensive conduct; neither the plaintiff's deposition testimony nor any other materials put forth in opposition to CHP's summary judgment motion demonstrate that a genuine issue of material facts exists as to discriminatory intimidation, ridicule and insult permeating the plaintiff's workplace to such an extent that a reasonable person would find the atmosphere hostile and abusive.  A hostile work environment claim is "not meant to set a general code for the workplace," *Ramey v. Potomac Elec. Power Co.,* 468 F. Supp. 2d 52, 58 n.8 (D.D.C. 2006), and

The plaintiff cannot base a claim on Dr. Ho's October 3, 2005 note at this stage of the proceedings. The Amended Complaint nowhere mentions Dr. Ho, his October 3, 2005 note or a new request for an accommodation on that date. Furthermore, the plaintiff's responses to the defendant's interrogatories list only three requests for accommodation: the first week of January 2004, the third week of January 2004, and mid-October 2004. Pl.'s Interrog. Resp. No. 4. While the plaintiff is not necessarily bound by her interrogatory responses, *see* 7 JAMES WM. MOORE ET AL., MOORE'S FEDERAL PRACTICE § 33.160 (3d ed. 1997), she still must demonstrate the existence of a genuine issue of fact. The plaintiff does not proffer any evidence that the notice was received by any CHP representative prior to her termination.

Furthermore, the plaintiff does not show that CHP failed to accommodate her disability. The parties do not dispute that CHP accommodated the plaintiff between 2001 and 2003 by excusing her from making onsite visits to hospitals and by allowing her to work from home beginning January 2004. *See* Pl.'s Opp'n at 10-11. CHP demonstrates that this arrangement continued for the duration of the plaintiff's employment – despite concerns for the privacy of medical records, the requirement that other UR nurses report to the office, revised duties assigned to the plaintiff, and some indication, based on Dr. Ho's March 3, 2004 note, that the plaintiff might return to the office if she were allowed to take frequent breaks. As the plaintiff preferred, *see* Pl.'s Resp. to Def.'s Req. for Admis. No. 3, she was allowed to work from home until her termination in October 2005.

---

"ordinary tribulations of the workplace," *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998), alone do not become an actionable hostile work environment claim.

*D. There Is a Genuine Issue of Material Fact Regarding the Reason for Plaintiff's Termination*

"When the defendant in a[n] . . . ADA case presents a legitimate, nondiscriminatory reason for its actions, the district court need resolve only one question to adjudicate a motion for summary judgment."  *Akridge v. Gallaudet Univ.*, 729 F. Supp. 2d 172, 181 (D.D.C. 2010) (footnotes omitted).  That question is:

> Has the [plaintiff] produced sufficient evidence for a reasonable jury to find that [CHP's] asserted non-discriminatory reason was not the actual reason and that [CHP] intentionally discriminated against [her]?

*Brady v. Office of Sergeant at Arms*, 520 F.3d 490, 493-94 (D.C. Cir. 2008); *see Adeyemi v. District of Columbia,* 525 F.3d 1222, 1226 (D.C. Cir.2008) (applying the *Brady* rationale to ADA case).  The defendant's burden is only one of production, and it "need not persuade the court that it was actually motivated by the proffered reasons."  *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254 (1981).  The plaintiff at all times bears the burden of persuasion to show that the defendant's proffered reason was not the true reason for the employment decision. *Id.* at 256.  Pretext may be established "directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence."  *Id.*; *see also Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000).  "Proof that the defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination, and it can be quite persuasive."  *Reeves*, 530 U.S. at 147 (citing *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 517 (1993) ("[P]roving the employer's reason false becomes part of (and often considerably assists) the greater enterprise of proving that the real reason was intentional discrimination."); *see also Aka v. Washington Hosp. Ctr.*, 156 F.3d 1284, 1290 (D.C.

Cir. 1998) (en banc) ("[A] plaintiff's discrediting of an employer's stated reason for its employment decision is entitled to considerable weight.").

In Count I, the plaintiff alleges that she "was subject[ed] to [an] adverse employment action when she was . . . fired because of her disability," Am. Compl. ¶ 50, while "other non-disabled employees were not subject to the treatment and adverse employment action[] that [CHP] levied upon Plaintiff," *id.* ¶ 51.  In Count III, the plaintiff alleges that she "engaged in ADA-protected activity when she requested that [CHP] provide her a reasonable accommodation for her disability," *id.* ¶ 69, yet CHP "terminated her employment," ¶ 72, and the termination "was directly related to Plaintiff's request for a reasonable accommodation," ¶ 73.  There is no dispute that termination is an adverse employment action and that a request for an accommodation is protected activity.  The plaintiff's success on either count turns on her ability to show that CHP's proffered reason for her termination is pretext for discrimination.

CHP asserts that the plaintiff was fired for insubordination.  CHP contends that during the October 5, 2005 conference call with Ms. Morris, Dr. Orr and Mr. Smith, the plaintiff "declined or was not able to provide any information as to what had transpired" with respect to Patient X.  Def.'s Mem. at 33.  Mr. Smith deemed her responses "insubordinate and unprofessional," *id.*, and when the plaintiff "failed to provide satisfactory information, either during the conversation . . . [or] after the conversation," *id.* at 34, Mr. Smith "decided to terminate [her] for insubordination and failure to provide information," *id.*  "What nailed it for [Mr. Smith] was [the plaintiff's] complete failure to respond to any questions about" Patient X, and "[t]hat's what actually resulted in the decision to terminate."  Smith Dep. at 124:4-7.

The plaintiff counters that she was fired for "her performance with regard to Patient X." Pl.'s Opp'n at 20.  Acknowledging her burden to "show that the proffered reason was not the true reason for the employment decision and some other discriminatory basis was," the plaintiff points to "[i]nconsistent statements and changing justification" for the termination decision as evidence "probative of pretext." *Id.*  For example, CHP's Answer asserts as its sixth affirmative defense that the plaintiff "was discharged for neglecting the welfare of a patient, a valid and legitimate reason, and not for any other reason."  Answer at 13.  This statement, she explains, "is consistent with the rationale provided . . . at the time of her termination."  Pl.'s Opp'n at 21.  In contrast, the plaintiff argues, CHP in this litigation provides "a completely different rationale for [her termination,]" namely her failure to respond to Mr. Smith's inquires.  *Id.*  At least one document in the record of this case both supports the plaintiff's argument and contradicts CHP's position: Mr. Smith's January 17, 2007 letter to the EEOC stating the plaintiff's termination came about because she "fail[ed] to perform her duties adequately" with respect to the discharge of Patient X.  Pl.'s Mem. in Opp'n to Def.'s Mot. to Dismiss, Ex. D.  Thus, there is some evidence in the form of the deciding official's own words that CHP's currently proffered reason is not the true reason for the plaintiff's termination.  Because this evidence "is entitled to considerable weight," *Aka*, 156 F.3d at 1290, a genuine issue of material fact precludes summary judgment for the defendant on the disparate treatment claim in Count I.  However, because of the temporal remoteness between the plaintiff's last request for an accommodation in October 2004 and her termination in October 2005, Count III will be dismissed.  *Compare Woodruff v. Peters*, 482 F.3d 521, 529 (D.C. Cir. 2007) (finding that "a reasonable finder of fact could infer causation" where "less than a month" elapsed between protected activity and adverse employment action), *with Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273-74 (2001)

(finding that 20-month period between employer's knowledge of plaintiff's protected activity and adverse employment action "suggests, by itself, no causality at all"), *Coons v. Sec'y of the Treasury*, 383 F.3d 879, 887-88 (9th Cir. 2004) (holding that, where a request for an accommodation was made one year prior to demotion, "[the] distant time sequence was inadequate to show a causal link" and plaintiff failed to make a prima facie case of retaliation), *and Richmond v. ONEOK, Inc.*, 120 F.3d 205, 209 (10th Cir. 1997) (affirming district court's conclusion "that the three-month period between the activity and termination, standing alone, does not establish a causal connection").

## III.  CONCLUSION

On consideration of CHP's motion and the plaintiff's response thereto, the Court concludes that there is a genuine issue of material fact in dispute with respect to the actual reason for the plaintiff's termination.  Its motion for summary judgment will be granted in part and denied in part.  An Order accompanies this Memorandum Opinion.


DATE:                                                                    ROBERT L. WILKINS
                                                                         United States District Judge